EDOK - Application for Search Warrant (Revised 5/13)



# United States District Court
### EASTERN DISTRICT OF OKLAHOMA

FILED
DEC 09 2019
PATRICK KEANEY
Clerk, U.S. District Court
By_____
Deputy Clerk

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES AND RESIDENCE WHICH IS LOCATED AT 16266 COUNTY ROAD 3655, ALLEN, OKLAHOMA 74825. | Case No. **MJ-19-106-KEW** |

## APPLICATION FOR SEARCH WARRANT

I, Lucas Keck, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the Eastern District of Oklahoma *(identify the person or describe property to be searched and give its location)*:

SEE ATTACHMENT "A"

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of Title 26, United States Code, Section 5861(d), and the application is based on these facts:

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
LUCAS KECK
SPECIAL AGENT, ATF

Sworn to before me and signed in my presence.

Date: 12/9/2019

_____
Judge's signature

City and state: __Muskogee, Oklahoma__

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Lucas Keck, a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn, depose and state as follows:

I am currently assigned to the ATF Tulsa Field Office in the Northern Judicial District of Oklahoma. I have been employed by ATF since 2015, and prior to my employment with ATF I was a Special Agent with the United States Secret Service (USSS) from 2009 through 2015. During my employment with the USSS, I conducted and participated in investigations for counterfeit currency, to include: purchasing counterfeit currency with confidential informants and undercover agents, identity theft investigations, credit card fraud, and bank fraud in both state and federal courts in the Southern District of Texas. During my employment with ATF and with the USSS, I have assisted other agencies and law enforcement, to include the Drug Enforcement Administration (DEA), with investigations regarding firearms and narcotics.

Prior to, and during, my employment as a federal agent I served in the United States Marine Corps for the past 19 years. I have received training as a Marine officer, an infantry officer, a Scout Sniper Platoon Commander, an intelligence officer, and as a foreign forces advisor. I have deployed to Iraq, Haiti, and the Republic of Georgia in either combat operations or foreign forces training missions. After entering the Marine Corps in 2000 as a second lieutenant, I attended The Basic School in Quantico, VA. The Basic School is a six month training program designed to expose all Marine Corps officers to the weapons employed by Marines. These weapons include rifles, pistols, machine guns, hand grenades, anti-tank rockets, claymore mines, plastic explosives, Bangalore torpedoes. After completing The Basic School, I attended the Infantry Officer's Course. This prepared me to lead Marines in an infantry platoon and infantry company. As part of this course, I employed weapons that an infantry unit possesses. These weapons included light, medium, and heavy machine guns, hand grenades, claymore mines, AT-4 anti-tank rockets, Shoulder Mounted Anti-tank Weapons, 40mm grenades, plastic explosives, and breaching charges. I have received explosives such as hand grenades, claymore mines, anti-tank rockets, and other explosives in original packaging in both training in the United States and combat operations outside of the United States. I have fired anti-tank rockets, thrown live hand grenades, and detonated live claymore mines, and have observed the capabilities and damage of each. As a

foreign forces advisor, I have taught foreign forces and foreign forces instructors on the use of military weapons, to include machine guns, hand grenades, and rocket launchers, to include receiving such items from the supply system, uncrating or removing them from original packaging, for the purpose of live fire of such items on ranges or in combat.

As a result of my training and experience as an ATF Special Agent, I am familiar with Federal offenses and know that it is a violation of Title 26 U.S.C. § 5861(d), for anyone to possess a firearm which is not registered to them in the National Firearms Registry and Transfer Record (NFRTR). Firearms listed in the NFRTR are defined within Title 26 U.S.C. § 5845, and include machine guns and destructive devices.

1.  I have participated in the execution of search warrants involving illegal possession of firearms. I have had training and experience in the investigation of various methods by which individuals attempt to circumvent the federal firearms laws. Based on this training and experience, I know that:

    a.  Firearms, such as machine guns, hand grenades, rockets, and anti-personnel mines, are tangible objects of habitual retention, meaning that once a person acquires a weapon of this type, they usually keep said weapons for long periods of time.

    b.  Owners of firearms tend to maintain at their residences, place of business, and their vehicles, documents reflecting their acquisition and ownership, including receipts, bills of sale, or notes.

    c.  Occupants of residences tend to keep and maintain various records and documents, including, for example, receipts, banking records, bills, statements, telephone records, and other similar indicia of ownership indicating occupation, possession, or control over the residence and business. Affiant seeks authorization to search for such indicia of ownership, which would tend to provide proof of control over other items of evidentiary value found in the search

2.  I have spoken with Explosives Enforcement Officers and have been told that items such as $CO_2$ cartridges are destructive devices when used to create improvised explosive devices and that grenades, rockets, and mines are destructive devices as defined under Title 18 U.S.C. 921(4). Such devices must be registered in the NFRTR.

3. This affidavit contains only the information I believe is necessary to support probable cause for this application. I have not included every fact or matter observed by me or known by other law enforcement officers. This information is based on my personal knowledge and observations during the course of this investigation, information conveyed to me by other law enforcement officers, and my review of records, documents, and other physical evidence obtained during this investigation.

## PROBABLE CAUSE

4. On August 30, 2019, SA Keck interviewed Justin PACHEACO in Ada, Oklahoma. SA Keck interviewed PACHEACO about machine guns manufactured from original Sten machine gun parts kits that had been recovered in Ada. In June 2019, a machine gun was recovered during the arrest of Neal MORRIS in Ada, OK, by the Oklahoma Highway Patrol (OHP). In July 2019, a machine gun was recovered by the Pontotoc County Sheriff's Office (PCSO) during the arrest of Ruthieann LESLIE in Pontotoc County, Oklahoma. Information developed in these two machine gun seizures led SA Keck to interview PACHEACO about manufacturing both machine guns. PACHEACO admitted that he had manufactured two Sten machine guns from parts kits and sold one firearm to Neal MORRIS. PACHEACO stated the second machine gun was seized during the arrest of his girlfriend, Ruthieann LESLIE, in July 2019.

5. PACHEACO told SA Keck that he obtained the Sten parts kits from Brad LILLARD. PACHEACO said that LESLIE and he had lived at LILLARD's residence, located near Allen, Oklahoma, from approximately January to April 2019. PACHEACO and LESLIE moved out after an argument with LILLARD, and PACHEACO took several parts kits for Sten machine guns with him, later assembling the machine guns himself. PACHEACO told SA Keck that LILLARD had multiple Sten machine gun parts kits at his residence, as well as Sterling machine gun parts kits, in addition to the parts kits that PACHEACO took. PACHEACO described tubes for the parts kits with paper template taped around them. PACHEACO said that he had watched LILLARD use a drill press at his residence to cut out the correct shapes in the tube using the paper template to manufacture a receiver for a Sten machine gun. SA Keck knows from experience that a template printed on paper and wrapped around a metal tube is a common method to manufacture the receiver

for a Sten machine gun, which can then be combined with a Sten machine gun parts kit to manufacture a Sten machine gun.

6. PACHEACO told SA Keck that LILLARD had other items besides machine guns at his residence. PACHEACO said that while living in LILLARDS's residence from January to April 2019, LILLARD was in possession of military style rockets, Claymore mines, hand grenades, and firearms silencers, all of which must be registered in the NFRTR pursuant to Title 26 U.S.C. PACHEACO described a rocket to SA Keck, and said that LILLARD allowed PACHEACO to fire one of three rockets that LILLARD possessed. The description matched SA Keck's experience with Light Anti-Tank Weapons (LAW's). PACHEACO described pulling a section of the rocket launcher to extend the tube, and pressing a trigger button on the top of the launcher. PACHEACO described a back blast that was loud and blew his hair around, a smoke trail following the rocket as it fired, and an explosion that threw dirt and debris. PACHEACO described a crater the rocket made in a pond dam located on LILLARDS property near the residence that was only a few feet in diameter. Based on SA Keck's experience firing anti-tank rockets larger and smaller than a LAW, SA Keck knows this description by PACHEACO is accurate.

7. PACHEACO described the Claymore mine to SA Keck as a directional anti-personnel mine. PACHEACO said that LILLARD used Claymore mines as booby traps on his property.

8. PACHEACO described two types of grenades to SA Keck. One was consistent with a style of hand grenade referred to as a pineapple grenade, and one style was described as a tear gas grenade. SA Keck has used tear gas grenades similar to this description while serving in the Marine Corps. PACHEACO said that LILLARD had removed the top from a pineapple grenade, and PACHEACO saw what he thought was a fuse and a granular powder inside. PACHEACO said these grenades were kept in 3 or 4 wooden crates. PACHEACO described the tear gas grenades as being stored in a cardboard tube sleeve and in crates. The tear gas grenades were grey with a red stripe. These items were consistent with what SA Keck knew were grenades and grenade packaging.

9. PACHEACO described manufacturing an improvised explosive device with a CO2 cartridge, sparklers, and black powder. SA Keck knows this description is accurate, and has had similar devices recovered in other ATF cases. PACHEACO said a video of this explosive was on his Facebook account, and the explosive was manufactured and used at LILLARD's residence. SA Keck noted that a video of PACHEACO using an explosive to generate an explosion in a container was found on PACHEACO's Facebook account. The video appeared to be in a rural area, in winter time, and in an area with metal items that had what appeared to be bullet holes and other damage. Two additional people besides PACHEACO can be heard off camera.

10. PACHEACO told SA Keck that LILLARD might have obtained or inherited some of the explosives and firearms from a cousin in Virginia or West Virginia.

11. PACHEACO claimed that LILLARD was also making and using methamphetamine at his residence.

12. Using maps on a cellular telephone, PACHEACO showed SA Keck where he believed LILLARD's residence to be.

13. SA Keck and local law enforcement identified a Brad LILLARD living at 16266 County Road 3655, Allen, Oklahoma, EDOK, consistent with the location shown by PACHEACO as LILLARD's residence. SA Keck noted a pond on the back portion of LILLARD's property. A query of the Pontotoc County Treasurer's Tax Roll confirmed a Brad LILLARD owning this property.

14. Local law enforcement told SA Keck that LILLARD and the residence were known to them from another investigation.

15. SA Keck initiated queries of the National Firearms Registry and Transfer Record (NFRTR). LILLARD and PACHEACO are not listed with items registered to them in the NFRTR,

and the serial numbers of the Sten machine guns seized in Pontotoc County are not registered with the NFRTR.

16. SA Keck believes that PACHEACO possesses knowledge of military style explosives and machine guns typically known to persons with military experience or firsthand observation/handling of such items. PACHEACO informed SA Keck that he had not served in any military branch. Based on PACHEACO's descriptions of machine guns, hand grenades, rockets, and anti-personnel mines, SA Keck believes there is credible information that such items are present at LILLARD's residence.

17. Based upon my training and experience, and the facts set forth herein, I believe there is probable cause that Brad LILLARD has violated Title 26, U.S.C. § 5861(d), possession of a firearm not registered to them in the National Firearms Registry and Transfer Record. Therefore, I believe I will find the items listed in ATTACHMENT B at 16266 County Road 3655, Allen, OK 74825, listed in ATTACHMENT A. I believe I will find the items listed in ATTACHMENT B in the residence listed in ATTACHMENT A because of my training and experience dealing with cases involving firearms as listed in this affidavit.

_____
Lucas Keck, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn and subscribed before me this 9th day of December, 2019.

_____
KIMBERLY E. WEST
United States Magistrate Judge

## ATTACHMENT A
## DESCRIPTION OF PREMISES TO BE SEARCHED

The property to be searched is: 16266 County Road 3655, Allen, OK 74825. The residence is further described as rural property located south of County Road 1560 on County Road 3655. The property is on the east side of County Road 3655, approximately .3 miles south of County Road 1560. The entrance to the property is located just north and east of a grain silo on the west side of County Road 3655.

The search of the residence at 16266 County Road 3655, Allen, OK 74825, within the Eastern District of Oklahoma, also includes any appurtenances to the real property, any storage units/outbuildings, any safes or other secured containers, any motor vehicles located on the property, as well as the property itself to include the ponds, trash piles, and any areas contained within the fenced 5 acres listed on tax rolls as part of the property.







# ATTACHMENT B

# DESCRIPTION OF ITEMS TO BE SEARCHED FOR AND SEIZED

1. Firearms, such as machine guns, hand grenades, rockets, and anti-personnel mines.

2. Firearms as described under Title 26, United States Code, to include machine guns, firearms silencers, and destructive devices;

3. Assembled improvised explosives devices and unassembled components of these devices to include, but not limited to: Metal, plastic or cardboard containers (i.e. propane bottles, pipe nipples, end caps, PVC pipe, galvanized pipe, cardboard tubes,bowls, rubber gloves) or other containers

4. Explosive fillers to include, but not limited to: Powders (i.e. black powder, smokeless powder, Pyrodex, flash powder) match heads, commercially manufactured high explosive materials (i.e. dynamites, slurries, emulsions), unmixed chemical powders and/or substances, gasoline, liquid chemicals that can be combined to produce an explosive material, flammable gases that when confined can result in an explosion.

5. Mixing bowls, glassware or other containers, spoons, funnels or other mixing implements.

6. Commercially manufactured detonators or improvised detonators, either electric or non-electric or other initiating components to include but not limited to: Flashbulbs, filaments, rocket motors, fuses (i.e. commercially manufactured hobby fuse, safety fuse, quick match, or other improvised fuses.

7. Electric components to include, but not limited to: wires/wiring, tape, wire connectors, shrink tube, wire ties, relays, switches, circuit boards, capacitors, batteries or other power sources, timing and remote control mechanisms.

8. Duct tape, electrical tape or other adhesive items.

9. Items to be used as fragmentation or shrapnel to include, but not limited to: Ammunition, Ball bearings, BB's, nuts, bolts, screws, nails, brads.

10. Tools commonly used in the manufacture of improvised explosive devices to include, but not limited to: Trays, punches, drills, drill bits, vices, wrenches, cutting implements, fastening implements, soldering irons, solder, circuit testers.

11. Literature pertaining to the assembly, manufacture and functioning of explosive devices or materials to include, but not limited to: Books, pamphlets, drawings, sketches, diagrams, photographs, computer generated or computer stored information of same.

12. Receipts showing the purchase of: Improvised explosive device components, chemicals, powders, tools, literature, address books, phone lists or other notes containing notes listing associates, contacts or sources of supply for improvised explosive device components.

13. Any items likely to be contaminated or show traces of any chemicals or explosive materials, including but not limited to carpeting/rugs, furniture cushions, vacuum cleaner bags and attachments.

14. Records to establish the persons who have control, possession, custody or dominion over property searched and from which evidence is seized, to include but not limited to: personal mail, checkbooks, personal identification, notes, other correspondence, utility bills, rent receipts, financial documents, keys, photographs, leases, mortgage bills and telephone answering machine introductions and messages, and all records related to pagers and telephones;

15. Items of personal property that tend to identify the person(s) in residency, occupancy, control, or ownership of the premises that is the subject of this warrant, including but not limited to: canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

16. Receipts, forms, ledgers, and documents related to the purchase of firearms. Ledgers/notes with information with contacts of individuals who have purchased/bartered firearms;